[Civ. No. 10728.   First Appellate District, Division Two.—February 9, 1938.]

GEORGE McDONALD et al., Respondents, v. MABEL BERWICK MASON, Appellant.

18

Silas W. Mack, John Milton Thompson and C. C. Baker for Appellant.

Hudson, Martin & Ferrante, Webster Street and Garth V. Lacey for Respondents.

STURTEVANT, J.—From a judgment quieting the title of the plaintiffs in and to a parcel of land bordering Carmel River, the defendant Mabel Berwick Mason has appealed.

The Mexican government granted to James Meadows a large tract on the north side of the Carmel River. That grant was confirmed and a patent was issued to James Meadows on May 19, 1859. One of the courses called for in the description contained in said patent is as follows: "Thence leaving the boundary of the Rancho 'Canada de la Segunda' and meandering up the center of the Carmelo River, north seventy-two degrees, forty-five minutes east, seven chains and thirty links to station." From the date of the patent down through the various conveyances the word "meander" does not appear in the history of the plaintiffs' title, nor in the history of the defendant's title. Meadows executed a quitclaim deed to

Bralee. That deed described the south line as follows: " . . . on the south by the Carmelo River or the southern boundary of the farm of the aforesaid James Meadows known as Rancho 'Palo Escrito' the said tract of land being part and parcel of the same farm." Bralee conveyed to Berwick by a grant, bargain and sale deed in 1869. It described the south line as follows: " . . . on the south by the Carmel River, on the southern boundary of the farm of James Meadows". In 1910 Berwick conveyed to his daughter Mabel (now Mrs. Mason, the appellant). That deed adopted the description contained in the deed from Bralee to Berwick just mentioned above by referring to the book and page wherein the former deed was recorded.

The lands on the south side of the Carmel River were surveyed in 1872. In making the subdivisions certain fractions were created. Later such lands were conveyed by the federal government. A portion thereof was by mesne conveyances transferred to C. S. Fackenthall et ux. In 1908 they conveyed to Philip McDonald. The description describes certain government subdivisions including lots 3 and 4 of section 24 but does not contain any reference to any monument.

It is not claimed that Carmel River now flows in the identical bed in which it flowed in 1859. When it changed and how it changed its course does not appear. Whether the banks were changed and to what extent they were changed by the formation of land, and whether in imperceptible degrees or by avulsion, does not appear.

The patent confirming the grant to James Meadows contained calls showing that the southern boundary was, to say the least, close to the Carmel River. The eighth course described is recited above. The following courses are from station to station. The plat attached to the patent shows a line following the middle line of the river. No evidence was offered attempting to show where the river flowed in 1859. As noted above, the lands south of Carmel River were surveyed and sectionized in 1872. Such surveys refer to and are tied into the lines described in the grant to James Meadows. The record shows lots 3 and 4 of section 24 of the federal survey. Lot 4 overlaps the grant to Meadows and part of the lands in suit. Lot 3 falls wholly outside said grant. The partition map of the James Meadows tract made

in 1905 was introduced by the plaintiff and was used to a considerable extent during the trial. That map purports to show the location of the river at that time with reference to the calls contained in the grant to Meadows. An enlargement of the scale of the description of that portion of the territory involved in this litigation shows the same facts more clearly. Scaling the maps it is noticed at once that in various places the middle line of the river is anywhere from one hundred to six hundred feet from the so-called ''meandering line''.

The nineteenth call in the description of the grant to James Meadows gives the course and distance of the line 32.50 chains in length. In the summer of 1913 the parties jointly built a fence on that line. The area of the ground between that fence and the middle line of Carmel River is about sixteen acres. ▊ The effect of the judgment appealed from is to hold the line on which said fence was built was adopted as the boundary line between the properties of the plaintiffs and defendant. It is conceded that the findings support the judgment but the defendant contends that some of the findings are not supported by the evidence. In making that contention the defendant earnestly contends that ''The doctrine of agreed boundary cannot be applied unless there was uncertainty as to the location of the true boundary line and the parties were trying to fix the location of the true boundary on the ground.'' (4 Cal. Jur., p. 429.) The defendant sets forth the memorandum opinion of the trial judge and asserts that the judgment against her was based on the sole proposition that when the parties located the fence they were acting under a mistake of law to the effect that the line on which they located the fence was the boundary line between the properties, whereas, as a matter of law, such boundary was the middle line of Carmel River. But the record before us shows that other material matters were adjudicated.

As early as May 4, 1911, the subject-matter of the boundary line between their respective properties had been under consideration between the parties. On that date Mrs. Mason, then Miss Berwick, wrote Philip McDonald as follows: ''At last I have seen Mr. Barber, and he says he will be very glad to place the fence, or let you place it as you desire the change. He would like however, to have the line settled as

soon as you conveniently can, as he wants to pasture the cows down there somewhere I believe. As I cannot come out and help put in the stakes, I wonder if Tom Bralee will help you if you need anyone. When I come back I can bring out the map and we can draw up a paper covering the changes which both can sign. And if you think advisable we can have a notary's seal. Father says either way is all right though the latter is possibly the safest for us both. Better yet would be for you to draw up the paper as you like it worded, and for me to sign it sometime when you are in town. We will each need to keep a copy. Take your own time about it, as I am agreeable to wait or settle as soon as I come back, about the seventeenth of May. Send in your bill for the wire fence when you decide what is fair to both of us. I don't know, and you and Tom do! Would it not be well to state in our paper that the line fence belongs to us equally?'' Why a delay followed, the record does not explain. However, toward the end of that year Miss Berwick married Mr. Rhodes, who went to her farm and there attended to certain work for her. About May 1, 1913, Mr. Rhodes was fishing on the Carmel River. Mr. McDonald went to him and the two started to look up and examine the monuments evidencing the boundary line between the parties to this action. Mr. McDonald showed Mr. Rhodes the monument at each end of the line on which said fence was later constructed. He stated to Mr. Rhodes that the fence should be on that line. About a week later Mr. McDonald went to the dwelling house of Mrs. Rhodes and there Mr. and Mrs. Rhodes and Mr. McDonald discussed the location of the fence. Acting in behalf of his wife, Mr. Rhodes wrote out, and Mr. McDonald and Mrs. Rhodes signed, a document as follows: ''Memorandum of agreement between Mr. McDonald and Mrs. Rhodes pertaining to fencing boundary between properties. Fencing to be four strand barbed wire, with posts twelve feet apart placed on line of survey as marked by county surveyor. Work to be done as soon as possible after cutting hay on ground at present, said hay and old fence to be property of Mrs. Rhodes. Each party to pay half the cost of fencing.'' Later the parties consulted Mr. Carmel Martin, an attorney at law. They had him draw up a formal written contract under date of the —— day of October, 1913. True it is that said document was never signed by either

party, however, Mrs. Mason testified the only objection to it was that it did not provide for gates in the fence. That document, among other things, recites:

"Whereas the true boundary between the parts of said ranchos owned by the respective parties hereto has been uncertain by reason of lack of particular description and survey,—

"Now therefore to establish the exact boundary line between the parts of the above mentioned ranchos owned by the parties hereto, it is hereby agreed that the following described line is and shall hereafter be held to be the true and correct boundary line between the parts of said above mentioned lands owned by the respective parties hereto." Then follows a boundary line which appears to be an exact copy of a part of the southern boundary of the grant to James Meadows as traced and mapped by Lou. G. Hare, county surveyor of Monterey County. Mrs. Mason called as a witness in behalf of the plaintiffs under section 2055 of the Code of Civil Procedure, testified that the fence was put up for the purpose of allowing Mr. McDonald to pasture some horses in the tract between said fence and Carmel River. She also testified that no correspondence was had between her and Mr. McDonald. She testified that no written agreements were signed by them or prepared for them to sign. The documents above quoted contradict all those statements. Such statements are further contradicted by a letter written by Mrs. Rhodes to Mr. McDonald on October 18, 1913. The body of that letter is as follows: "Carmel (Martin?) writes to me today that the papers are at Mr. Gould's office for us to sign. Will you please go in there some day before long and sign if they are OK? They seem all right save that the fence was not quite as we desired so I have asked Carmel to put that right and let you know." Mr. Rhodes testified that he consulted Mr. Martin and was advised by him that the boundary line followed the river and that he, Mr. Rhodes, informed Mr. McDonald of the advice. Mr. Martin testified positively that the parties never mentioned to him anything regarding a meandering line; however, he was quite positive they were entirely disagreed as to where the boundary was. He told them to bring him a survey and he would prepare a written agreement for them to execute. That document we have quoted from above. After the fence was built in

1913, and down to the year 1933, the fence remained in place and, except to gather driftwood and to take a few loads of sand, Mrs. Mason and her agents never exercised any dominion over the ground in dispute.

The contention of the defendant that no uncertainty existed at the time the parties put up the above-mentioned fence in 1913 has no merit. From what has been stated above, there was clearly evidence supporting the finding of the court that an uncertainty did exist. ■ However, as we understand the defendant, her entire claim is to the effect that it was a patent fact that Carmel River was at least near the southern boundary of the James Meadows grant, although there was no specific call in said grant that designated the river as the south line of said grant. A line ran along the river. The defendant calls it a meander line and therefore not a boundary, but that the boundary would be the middle line of the river.

To that claim there are two distinct and complete answers. It will be conceded at once that the general rule is as contended by the defendant, however, there is a well-defined exception. In *Lammers* v. *Nissen*, 4 Neb. 245, 251, the Supreme Court of Nebraska said: ''In *Granger* v. *Swart*, Fed. Cas. No. 5,685, 1 Wool. C. C. R. 88, 91, the principle is enunciated that if between the meander line, by which the government survey was made, and the bank of the river, there is, at the time, a body of swamp or waste lands, or flats, on which timber and grass grew, and horses and cattle fed, then the patents for the lands surveyed would not cover this land, but must be confined to the actual limits of the meander line, and include no more.'' That case was appealed to the United States Supreme Court and was affirmed on the identical grounds stated by the state court. (154 U. S. 650, Appx., 14 Sup. Ct. 1189, 25 L. Ed. 562.) In the case entitled *City of Denver* v. *Pearce*, 13 Colo. 383 [22 Pac. 774, at page 776, 6 L. R. A. 541], the court said: ''In descriptions of this nature, the stream is the monument, and the thread of the stream the boundary. The language of the description, however, is but *prima facie* evidence that the grant or deed is intended to convey all that the grantor owns. It is but a presumption. Whether this presumption shall prevail, is in all cases to be determined by a consideration of the language used by the parties, and such surrounding circum-

stances as are proper to be considered in ascertaining their intentions." In *Barnhart* v. *Ehrhart*, 33 Or. 274 [54 Pac. 195, 197], the Supreme Court of Oregon said: "But when, for any reason, the surveyor omits to include large tracts of land lying between the meander line as surveyed or as pretended to have been run upon the ground and such streams or bodies of water, the patents for the lots, though referring to the official plat of such survey for identification, are not equivalent to a conveyance of the premises to such navigable stream, lake, or bay, but are grants limited by such meander line." The court cites many authorities. An examination discloses that the case has since been cited and followed in many other cases. In *Niles* v. *Cedar Point Club*, 175 U. S. 300, at page 308 [20 Sup. Ct. 124, 44 L. Ed. 171], the court said: "But, it is urged, that the fact that a meandered line was run amounts to a determination by the land department that the surveyed fractional sections bordered upon a body of water, navigable or nonnavigable, and that, therefore, the purchaser of these fractional sections was entitled to riparian rights; and this in face of the express declaration of the field notes and plat, that that which was lying beyond the surveyed sections was 'flag marsh', or 'impassable marsh and water'. But there is no such magic in a meandered line. All that can be said of it is that it is an irregular line which bounds a body of land, and beyond that boundary there may be found forest or prairie, land or water, Government or Indian reservation." Some of the authorities cited were cases involving navigable waters. That distinction is of no assistance to this defendant. The record does not show that Carmel River is in fact navigable or that it has been declared a navigable stream. The grant to James Meadows does not show that the southern line was run as a "meander line". At the time it was run, or at any other time, the law did not authorize the surveyor to run a meander line under the existing facts. The statute required that "the public lands shall be divided by north and south lines run according to the true meridian, and by others crossing them at right angles, so as to form townships of six miles square, unless where the line of an Indian reservation, or of tracts of land surveyed or patented prior to May 18, 1796, *or the course of navigable rivers,* may render this impracticable; and in that case this rule must be departed from no further

than such particular circumstances require." (43 U. S. C. A., sec. 751; R. S. 2395; Act of May 18, 1796; 1 Stats. 465.) In the absence of a showing to the contrary, we must assume the surveyor followed the law and did not run a meander line under facts and circumstances not authorizing one. As shown above the federal government did not treat the courses numbered 18–24, mentioned in the grant to James Meadows, as a meander line. On the contrary, the later survey made in 1872 tied lots 3 and 4 of section 24 into and adopted said lines as a part of the latter survey. It is clear, therefore, that whether the line running along Carmel River was or was not a meander line was a question to be determined by the trier of the facts. The trial court found the facts in favor of the plaintiffs. Those findings, as shown above, are supported by an abundance of evidence and are controlling in this court.

The judgment appealed from is affirmed.

Nourse, P. J., and Spence, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on March 11, 1938, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 8, 1938.